J-A05004-26

| | | |
|---|---|---|
| CARMEN ENTERPRISES, INC., | : | IN THE SUPERIOR COURT OF |
| F/D/B/A CRUISE HOLIDAYS OF | : | PENNSYLVANIA |
| NORRISTOWN AND | : | |
| BYEBYENOW.COM TRAVEL STORE, | : | |
| AND BRUCE J. CHASAN | : | |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| ELY GOLDIN AND FOX ROTHSCHILD, | : | |
| LLP | : | No. 420 EDA 2025 |

Appeal from the Order Entered February 7, 2025
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  210201913

BEFORE:  KUNSELMAN, J., NICHOLS, J., and SULLIVAN, J.

OPINION BY KUNSELMAN, J.: **FILED JUNE 9, 2026**

## I.     Introduction

In this case brought pursuant to Pennsylvania's Wrongful Use of Civil Proceedings Act ("WUCPA"),[1] the Plaintiffs, Carmen Enterprises, Inc. and Bruce J. Chasan, Esq. appeal from the order granting summary judgment to the Defendants, Ely Goldin, Esq. and Fox Rothschild, LLP (collectively, "the Law Firm").  Attorney Chasan claims the trial court incorrectly ruled that he lacks standing.  We find no error in that decision, because an attorney's right to recovery is through or against his former client, not the opposing party or that party's legal counsel in the underlying lawsuit.

Carmen Enterprises brings three claims of error, including a challenge to an order permitting the Law Firm to retract a December 20, 2005 Fax that

_____

[1] **See** 42 Pa.C.S.A. § 8351.

it gave to Carmen Enterprises during discovery. The trial court erred by assuming (without deciding) that attorney-client privilege or the work-product rule shielded the fax from discovery. Because the Law Firm failed to prove the existence of either shield, we reverse the order allowing it to "clawback" the December 20, 2005 Fax.

Carmen Enterprises also contends that the trial court granted summary judgment erroneously. We agree. The record contains genuine issues of material fact that are sufficient to submit this matter to a jury. Hence, we partly affirm, partly reverse, and remand for trial.

## II. Factual & Procedural Background

To understand the claims presented in this case, we present a detailed recitation of the facts from the underlying litigation, as well as the factual and procedural history of the present WUCPA case. The underlying litigation began in Montgomery County more than 25 years ago.

*A. The Underlying Litigation*

In 1990, Attorney Chasan incorporated Carmen Enterprises, a travel agency.[2] It operated Cruise Holidays of Norristown and BuyBuyNow.com Travel Store. Seven years later, Robert Douglas Carpenter, Jr. and Kate Murphy formed and co-owned Murpenter, LLC. Murpenter was a competitor travel agency of Carmen Enterprises and operated Uniglobe Wings Travel.

---

[2] In the mid to late 1900s, travel agencies were common businesses that people hired to book their airline tickets, cruises, hotel rooms, and tours. Travel agencies have largely become obsolete in the digital age.

On October 31, 2001, Carmen Enterprises and Murpenter entered into a business deal that went sour.  In 2002, Carmen Enterprises sued Murpenter in the Court of Common Pleas of Montgomery County.  Murpenter hired Attorney Goldin to defend it.  During the litigation, he joined Fox Rothchild, LLP.

In a previous appeal, President Judge Emeritus Jack Panella described the facts and procedural posture of that case as follows:

> On October 31, 2001, Carmen [Enterprises] sold the assets of Cruise Holidays to Murpenter, including what was purported to be a list of 1,900 customer names and addresses.  The Purchase and Sales Agreement ("Agreement") included a fixed and formulaic schedule of remittances to be paid by Murpenter, with the last payment due on November 10, 2002.  Paragraph 13 of the Agreement provided:  "Any payment that is more than five calendar days late is subject to an automatic 10 percent late fee. [Murpenter] agrees to pay the cost of any collection suit, including reasonable attorney's fees."  Agreement at ¶ 13.

> Murpenter also agreed to pay certain commissions to Carmen [Enterprises] over the twelve months following the date of the Agreement, which were to be offset by the scheduled payments noted above.  Murpenter assumed the lease for a Compaq computer, which contained part of the customer list that was accessible through "My Advanced Mail List" software installed on the computer.  The other portion of the customer list was accessible through "CruiseWeb" database.  Together, the lists contained over 1,900 names and addresses.  Prior to the sale, [Attorney] Chasan showed Mr. Carpenter and Ms. Murphy how to access the list on the Compaq computer.  Although the hiring of employees was not a condition of the Agreement, Murpenter hired several of Carmen [Enterprises'] former employees, including lead-sales-person Jane Couchara.  Ms. Couchara was familiar with the Compaq computer and with Carmen [Enterprises'] electronic-client-list files.

- 3 -

[Attorney] Chasan relinquished the keys to the Carmen [Enterprises] store to Murpenter on November 1, 2001. [Four weeks later], Ms. Murphy emailed [Attorney] Chasan asking for a readable computer disk containing the active-client list described in the Agreement.

[Attorney] Chasan responded that the disk had been left on Ms. Couchara's desk and was readable in the Compaq computer. He told Ms. Murphy that if there was a problem reading the disk, he would lend Murpenter the software to load into one of their own computers. On November 30, 2001, Ms. Murphy responded that the disk was unreadable and asked for the software. [Attorney] Chasan sent the software disk and instruction pamphlet to Murpenter on December 3, 2001, and emailed Ms. Murphy and Mr. Carpenter to tell them it was on its way via certified mail.

Murpenter [made the] scheduled payments through March 2002. However, it paid the December 2001 and March 2002 payments late, thus generating late fees pursuant to Paragraph 13 of the Agreement. Murpenter never paid the late fees. It stopped its payments in April 2002, because [Mr. Carpenter and Ms. Murphy mistakenly believed that Carmen Enterprises] had not provided a list of 1,900 **active** customers, as promised in the Agreement.

On April 17, 2002 . . . Carmen [Enterprises] sued Murpenter, alleging breach of express and implied contract, trespass/property damage, conversion, and interference with contractual obligations. [Attorney Chasan was not a named plaintiff. However, he represented Carmen Enterprises during the litigation. Carmen Enterprises] sought specific performance, indemnification, replevin, and damages, including attorneys' fees. Among other things, Carmen [Enterprises] sought to recover the late fees owed on the December 2001 and March 2002 payments; the April 1, 2002 payment of $7,500; plus fees, costs, commission payments, and attorneys' fees. Murpenter filed an answer, new matter, and [three] counterclaims . . . .

*Carmen Enterprises, Inc. v. Murpenter, LLC*, 1115 EDA 2014, 2015 WL

6698621 at *1-2 (Pa. Super. 2015), *reargument denied* (2015), *appeal*

*denied*, 141 A.3d 477 (Pa. 2016) (non-precedential decision) (some punctuation omitted) (emphasis in original) ("***Carmen I***").

In its first counterclaim, Murpenter alleged fraud. It claimed that Carmen Enterprises supplied a list of customers' names and addresses less than the 1,900 names promised in the Agreement.

Murpenter also filed a counterclaim of conversion. It alleged that, one evening, after selling Carmen Enterprises' assets to Murpenter, Attorney Chasan found Murpenter's employee manual on a desk in the office. Attorney Chasan photocopied the 15-page manual and, without damaging it, returned the manual to the employee's desk.

Murpenter's third counterclaim was for "Set Off." That counterclaim did not allege a new cause of action or even that Carmen Enterprises breached the Agreement. Instead, the counterclaim of set off incorporated Murpenter's first and second counterclaims by reference and sought a reduction of Carmen Enterprises' ultimate award to "the extent that [Carmen Enterprises] is found to be liable to Murpenter under the preceding [counter]claims or under the [Agreement], such indebtedness . . . or judgment should be set off against any liability that Murpenter may have to [Carmen Enterprises]." Second Amended Complaint, Ex. V, Murpenter's First Amended New Matter Counterclaim in ***Carmen I*** at 4.

After receiving the counterclaims, Attorney Chasan called Attorney Goldin to discuss "the various pleadings and discovery responses . . . [of] June 24-25, 2002." ***Id.***, Ex. W, June 28, 2002 Letter from Chasan to Goldin at 1.

Attorney Chasan sent a follow-up letter to his phone call, wherein he warned

Attorney Goldin that the counterclaims had no basis in fact or law.

Attorney Chasan wrote:

The first counterclaim, common-law fraud, is complete garbage. Your client is in for a big fall and exposure to sanctions, including huge attorney's fees. I will point you in the right direction. Look at [Murpenter's] document production, especially MUR 000036 and 000037. This is proof that your client received the right disk [that contained over 1,900 customers' names]. However, the amended counterclaim makes no reference to this disk. Maybe [Murpenter] lost or misplaced it. In any event, that is the disk requested in Req. No. 1 of [Carmen Enterprises'] request for production. If you obtain that disk from your client and produce it, the counterclaim based on fraud disappears in an instant. If you don't hunt down this disk, [Carmen Enterprises] will surely seek sanctions against you personally, too.

By the way, [Carmen Enterprises] has no problem in copying the data again and sending it to you on another disk. I would have done that at any time and am willing to do it again now. You will get the exact same files (Sales-01 and Concise2) described in my e-mail of November 28th 2001 (MUR 000036). There are 1,915 names and addresses. As I explained to you . . . only 19 are duplicates.

In short, the averments in [Murpenter's] fraud claim are mistaken and worthless. If you continue to pursue it, you do so at your own peril.

As to the second counterclaim, based on alleged conversion, I am sure you recognize the difficulty [Murpenter] will have in proving liability, **let alone damages**. Again, proceed at your peril.

*Id.* at 1-2 (emphasis added). Thus, Attorney Chasan indicated to Attorney

Goldin that, under Pennsylvania law, a counterclaim for conversion requires

proof of actual damages.

- 6 -

Three-and-a-half months later, Attorney Goldin admitted to finding the disk with the list of customers' names. He wrote, "I also have in my custody the original Advanced Mail List software and the disk containing the list of names." *Id.*, Ex. Y, October 11, 2002 Letter from Goldin to Chasan at 1. "I am going to make a copy of the disks for my files over the weekend and bring the originals to [Ms. Murphy's] deposition on Monday." *Id.*

At the deposition, Attorney Goldin produced a disk with the Advanced Mail List software and a hardcopy of the software's instructions. However, he did not produce the disk with the list of 1,915 customers' names as promised. *See* Murphy's Depo., 10/14/02, at 8-9. Attorney Chasan asked Ms. Murphy about the location of the disk with 1,915 customers' names. He did so in the context of Carmen Enterprises' request for production of the disk and a trial court order compelling Murpenter to produce that disk.

Attorney Chasan asked:

> Ms. Murphy, Exhibit Three is [Carmen Enterprises'] First Request for Production of Documents that was served by [Carmen Enterprises to Murpenter] . . . on May 22, 2002. Have you seen this document before?
>
> A: No.
>
> Q: [Carmen Enterprises requested production of] the computer disk of [Carmen Enterprises'] client names and addresses, provided by [Carmen Enterprises] to [Murpenter] on or about November 27, 2001 . . . Has [Murpenter] produced that computer disk?
>
> A: Is it that one [which Attorney Goldin produced at the start of this deposition]? I don't know.
>
> Q: You don't know?

> A:   We never [saw] the computer disk.
>
> \*     \*     \*
>
> Q:   One of the items mentioned in the record this morning by [Attorney] Goldin was a three-and-a-half inch diskette, yellow in color, which has the notation on it, "Cruise Web at 11/1/01." Have you seen that disk before?
>
> A:   Just this morning, when it was handed to you.

*Id.* at 38-40.

Attorney Chasan then showed Ms. Murphy the instruction pamphlet for the Advanced Mail List software, *i.e.*, the program capable of reading the disk that Carmen Enterprises provided to Murpenter with the 1,915 customers' names. He asked Ms. Murphy if she ever saw the software's instruction pamphlet. She had not. *See id.* at 41. Similarly, Ms. Murphy had never seen the Advanced Mail List software disk itself, which had the program capable of reading Carmen Enterprises' list of 1,915 customers' names. *See id.* at 42.

Thereafter, they discussed a demand that Ms. Murphy made on February 28, 2002, for the 1,915 names. Attorney Chasan drew Ms. Murphy's attention to an email she had sent to him and said:

> it says, "Where is 2C [*i.e.*, the Agreement section requiring Carmen Enterprises to provide over 1,900 customers' names,] delivered to [Murpenter] on a readable disk?" Do you see that?
>
> A:   Yes.
>
> \*     \*     \*
>
> Q:   Exhibit 32 . . . Is this an email that you received from me on November 28[, 2001]?
>
> A:   . . . yes . . .

- 8 -

Q:     . . . it says, "I have copied the mail list onto a disk and placed the disk in a sealed Airborne Express envelope on Jane's former desk.  There are two files:  Sales-01 and Concise2.  Although there are about 1,915 names and addresses.  If you have any trouble reading the disk, I have the software, My Advanced List, which I can lend you to load on one of your computers.  Frankly, I thought you had already copied the list, based on the fact that I saw numerous mailing labels around the store in connection with your mailing."  Do you recall reading that paragraph in November?

A:     Not off the top of my head, no.

Q:     Does [Murpenter] have a disk that is marked Sales-01 and Concise2?

A:     Do I?  No.

                    *      *      *

Q:     Exhibit 33 is . . . an email message of Friday, November 30, 2001 from you to me.  Is that correct?

A:     Yes.  Correct.

Q:     You wrote in the first paragraph, "The disk [Carmen Enterprises provided] is unreadable without the [My Advanced List] software.  You need to either deliver to us a readable disk with 'txt' file extension or the [My Advanced List] software to make your disk readable.   This was due on October 31st; it is now the 30th of November, and I had to ask you to deliver what I believe is rightfully ours."  Do you remember writing that?

A:     Yes.

Q:     What did you mean by "the disk was unreadable Without the software?"

A:     I was told that [our computers] couldn't export any names.  That they couldn't read anything.  [It] didn't work.

Q:     Who told you that?

A:     Terry Vaughan.

Q:   Did you personally see the disk that she was referring to?

A:   No.

Q:   Do you know what Terry Vaughan did with that disk?

A:   No, I don't.

                    *      *      *

Q:   Exhibit 34 . . . is an email from me to you; is that correct?

A:   Yes.

Q:   Did you receive this email?

A:   I believe so.

Q:   This was dated December 2[, 2001].  And the first paragraph says, "I will mail you the software for My Advanced Mail list, by certified mail, return receipt requested.  I will also mail the instruction pamphlet, which you can copy and then return along with the software disk . . .

     The second paragraph says, "load it on your computer and then you will be able to read and manipulate all the data on the disk.  Note, as I indicated to you long ago and showed you in early September [of 2001], this is an MS-DOS software from 1990, and it probably does not convert to a 'txt' file extension."  Do you see that?

A:   Yes.

Q:   . . . Did you personally load the My Advanced [Mail] software?

A:   No.

Q:   Did you give it to somebody to load?

A:   I believe I gave it to Terry [Vaughan], but I don't remember . . .

Q:   Was there any problem in loading it?

> A: I can't say for sure, but I just remembered that she said it didn't work right, and that she couldn't get 1,900 names. And there were a lot of duplicates.

*Id.* at 113-20.

When asked if she took any steps to determine if Murpenter had mixed up the disks that Carmen Enterprises gave it, Ms. Murphy said, "No." ***Id.*** at 160. But, she had no idea if Murpenter had "done any investigation to confirm or refute that" it mixed up the two disks. ***See id.*** at 160-61.

Similarly, Mr. Carpenter had no knowledge of and made no attempt to access the data on the disks. ***See*** Carpenter's Depo., 10/16/02, at 29-30. Instead of investigating whether the disk and software worked, Mr. Carpenter relied upon Ms. Vaughan informing him that she could not "get any information from the list that was supposedly on My Advance Mail list." ***Id.*** at 90. "After repeated conversations with Terry [Vaughan] as to how she was proceeding with getting more information from [Attorney Chasan, Mr. Carpenter] figured that [Carmen Enterprises] did not have [the 1,915 names] and [was] ***in breach of contract***." ***Id.*** at 89 (emphasis added). Mr. Carpenter did not testify that he ever believed Carmen Enterprises had lied to Murpenter or that Murpenter relied upon an allegedly false or misleading statement by Carmen Enterprises. ***See id.***

Then, on October 22, 2002, Attorney Goldin deposed Attorney Chasan, in his role as President of Carmen Enterprises. After explaining the difference between the two disks that Carmen Enterprises had provided to Murpenter in the fall of 2001 and how the My Advanced Mail software worked, Attorney

Chasan handed Attorney Goldin a new copy of the disk containing the 1,915 customers' names. Attorney Chasan testified that he was "turning over to you, today, a copy of a disk that I copied from the MAIL list program on October 14th. I put a Bates label, "Carmen 668." It has 718 names on Concise-2 and 233 names on Sales-01. And your client can have as many copies of this list as you want . . . I made that copy from the computer hard drive last week." Chasan's Depo., 10/22/02, at 145.

Next, Carmen Enterprises hired Peter Liebert, an expert in computer programming, to conduct "an independent examination of [the] computer hard drive and various computer disks" that were at issue. Liebert's December 2, 2002 Affidavit at 1. Mr. Liebert's findings supported Attorney Chasan's factual claims, including that "the Concise2 database on the MAIL directory of the subject computer . . . include[s] 1,718 names and addresses," and "the Sales-01 database . . . include[s] 233 names and addresses." *Id.* at 4.

After reviewing the emails that Attorney Chasan had discussed with Ms. Murphy during her deposition, Mr. Liebert also concluded:

> without a doubt, that the disc labeled "Cruise Web at 11/1/01" . . . is **not** the disk described in MUR 000036-39, because "Cruise Web at 11/1/01" has a file with a 'txt' file extension. Ms. Murphy's own email of November 30, 2001 stated that the disc that [Murpenter] received from [Attorney] Chasan in late November 2001 did not have a 'txt' file extension.
>
> 19. It is notable that the "Cruise Web at 11/1/01" disk . . . was made on November 2, 2001 at 5:00 p.m. and the C drive of [Carmen Enterprises'] computer reveals that the Sales-01.EXP file was created in the "My Advanced Mail List" program at 4:53 PM on November 2, 2001. This

> suggests to me that someone was copying and mailing lists from both the CruiseWeb directory and the MAIL directory from the C drive of the subject computer within a seven-minute period on that date.

*Id.* at 7 (emphasis in original). In other words, someone inside Murpenter had exported the full list of Carmen Enterprises customers from Carmen Enterprises' computer two days after the travel agencies executed their October 31, 2001 Agreement. Despite having the above evidence that Murpenter accessed the full client list two days after the businesses made their deal, and despite receiving a new copy of the full list of Carmen Enterprises' customers during Attorney Chasan's October 22, 2002 deposition, Attorney Goldin continued to prosecute Murpenter's counterclaim of fraud.

Eventually, Carmen Enterprises:

> filed motions for partial summary judgment with regard to Murpenter's fraud [and conversion] counterclaim[s] and for sanctions.
>
> On January 7, 2003, Murpenter filed a motion for partial summary judgment arguing that Carmen [Enterprises] should be precluded from obtaining counsel fees for services provided by [Attorney] Chasan, because he was essentially a *pro se* litigant not entitled to counsel fees. On June 17, 2003, the Honorable Steven T. O'Neill entered several orders that . . . denied Carmen [Enterprises'] motion for partial summary judgment . . . and granted . . . partial summary judgment [to Murpenter] on Carmen [Enterprises'] claim for counsel fees. The court, thus, precluded [Attorney] Chasan from receiving any contractual attorney's fees for his representation of Carmen [Enterprises]. The June 17th Order did not preclude the payment of attorneys' fees to outside counsel. Judge O'Neill denied Carmen [Enterprises'] motion for reconsideration.
>
> Extensive discovery and motions proceedings ensued. Carmen [Enterprises] served its first set of requests for

- 13 -

admissions in response to Murpenter's fraud counterclaim. Murpenter did not respond, and the requests were deemed admitted pursuant to Rule 4014 of the Pennsylvania Rules of Civil Procedure. Carmen [Enterprises] then renewed its motion for partial summary judgment on the fraud counterclaim based on those admissions. Judge O'Neill granted the motion and dismissed the fraud counterclaim on February 2, 2004.

*Carmen I* at *2. Judge O'Neil also granted Carmen Enterprises summary judgment on Murpenter's counterclaim of conversion.

Then, in July of 2004, Carmen Enterprises propounded its Sixth Set of Interrogatories to Murpenter. Interrogatories 26-29 of that document asked who, on Murpenter's staff, had exported the list of 1,915 customers' names from Carmen Enterprises' computer, on November 2, 2001.

A year-and-a-half later (and after a court order to compel Murpenter's responses), Murpenter finally answered the Interrogatories. Its answers to Interrogatories 26-29 were identical. Murpenter said, "This information was elicited by [Carmen Enterprises] during depositions." Murpenter's November 7, 2005 Answer to Carmen Enterprises' Sixth Set of Interrogatories.

That response was obviously false. During the initial depositions of Ms. Murphy and Mr. Carpenter, Carmen Enterprises could ***not*** have asked who, on Murpenter's staff, had copied and exported customer lists from Carmen Enterprises' computer on November 2, 2001. At the time of their depositions, Attorney Chasan had not yet hired Mr. Liebert to examine Carmen Enterprises' computer. As Attorney Chasan explained to the trial court in this WUCPA case, "The question didn't come up in [those early] depositions, because it wasn't

figured out until later on" that Murpenter personnel copied and exported the full list on November 2, 2001. N.T., 1/25/23, at 28.

On December 20, 2005, the Court of Common Pleas of Montgomery County convened a sanctions hearing to review Murpenter's at-best-evasive answers to the Sixth Set of Interrogatories. As Attorney Chasan explained at that hearing, he "wouldn't have asked the question if the information was in the depositions." N.T., 12/20/05, at 87.

Attorney Goldin said, "To the extent the court feels this is not an adequate answer - -" *Id.* at 86.

The trial court interjected:

> No, it's not an adequate answer, and you know it's not an adequate answer. I don't know why you would play these games with [Attorney Chasan,] if you know that anything that you answer like this, that he is going to sit up at nights, and he's going to read each thing . . . We'll have the ancillary issue [on sanctions, Attorney] Goldin, so that your answer [hereafter] is not just BS, because you didn't feel like looking at it or – worse yet – you didn't feel like answering it. I don't think it was that hard of a question to answer. It was either nobody, or somebody, or whoever was around.

*Id.* at 86-87.

The court gave Attorney Goldin five days to send it a letter identifying where, in the depositions, the witnesses answered Interrogatories 26-29. He sent the trial court a letter that included attachments of sections of the transcripts from the depositions. None of those sections contained answers concerning the events of November 2, 2001. The Court of Common Pleas of Montgomery County imposed $1,000 in sanctions on Murpenter. No one took

further actions on the Interrogatories at issue during **Carmen I**. However, as discussed below, Attorney Goldin actually had answers to Interrogatories 26-29, but he did not produce them prior to or during the sanctions hearing.

Years of discovery ensued, and, shortly before the case was set to head to trial, Attorney Goldin directed Murpenter to hire Edward J. DiDonato, Esq. (a partner at Fox Rothchild) to file for Chapter 7 bankruptcy. The bankruptcy petition stayed the proceedings in **Carmen I** and delayed the trial for a year. Carmen Enterprises moved for the bankruptcy court to vacate the stay, which that court granted. **See In re Murpenter LLC**, 12-CV-5060, 2012 WL 6645538 (E.D. Pa. 2012) ("**Murpenter I**").

As President Judge Emeritus Panella further explained:

> Carmen [Enterprises] then filed a sanctions motion in bankruptcy court, [which] . . . agreed and awarded fees to Carmen [Enterprises], including counsel's fees for [Attorney Chasan. Carmen Enterprises appealed and argued that the award was too low. In a judgment order, the United States Court of Appeals for the Third Circuit adopted the opinion of the district court and affirmed. **See In re Murpenter LLC**, 550 F. App'x 114 (3d Cir. 2014) ("**Murpenter II**").]
>
> In April 2013, a bench trial in [**Carmen I**] ensued before the Honorable Richard P. Haaz. On July 9, 2013, the court found in favor of Carmen [Enterprises] . . . and awarded damages of $45,057.47. Carmen [Enterprises] filed a post-trial motion to mold the verdict to include . . . contractual attorneys' fees, and post-judgment interest. Murpenter filed a post-trial motion asking the court to vacate its decision or order a new trial.
>
> Carmen [Enterprises] filed two motions for sanctions against [the Law Firm] alleging dilatory, obdurate, and vexatious conduct during the course of the litigation. After oral argument, the court granted Carmen [Enterprises'] motion to mold the verdict and denied [its] motions for

- 16 -

sanctions and Murpenter's post-trial motion . . . [T]he court entered a final order of judgment in favor of Carmen [Enterprises] for $160,833.34, plus post-judgment interest. The order included attorneys' fees for Carmen [Enterprises'] four outside counsel[. However, the order] did not include fees for legal services performed by [Attorney] Chasan . . . Both parties appealed.

**Carmen I** at *2-3. We affirmed the $45,057.47 non-jury decision in favor of Carmen Enterprises.

Regarding Carmen Enterprises' motion for Murpenter to pay Attorney Chasan's fees and costs, "Murpenter maintained that [Attorney] Chasan, as Carmen [Enterprises'] principal counsel and owner, was essentially representing himself and Carmen [was] not entitled to counsel fees for *pro se* representation." **Carmen Enterprises, Inc. v. Murpenter, LLC**, 185 A.3d 380, 383 (Pa. Super. 2018), *reargument denied* (2018), *appeal denied*, 201 A.3d 725 (Pa. 2019) ("**Carmen II**"). A majority of the **Carmen I** panel "disagreed . . . and remanded for the trial court to determine a reasonable fee." **Id.** at 383–84.

On remand, the trial court ordered Murpenter to pay Carmen Enterprises $450,400 for Attorney Chasan's fees and costs. The parties cross-appealed. On April 25, 2018, we affirmed. **See id.**

Carmen Enterprises then moved for the Montgomery County trial court to mold the judgment to add the attorney's fees and costs that it incurred during the cross-appeals in **Carmen II**. The court granted that motion and amended the final judgment in favor of Carmen Enterprises to $581,233.34, plus interest. By then, Mr. Carpenter and Ms. Murphy had formed new travel

- 17 -

agencies and had transferred all of Murpenter's assets to those entities. Murpenter was therefore judgment proof.

B.    *The Current WUCPA Litigation*

About two years later, on February 22, 2021, Carmen Enterprises and Attorney Chasan filed this WUCPA action in the Court of Common Pleas of Philadelphia County against Murpenter, Mr. Carpenter, Ms. Murphy, Attorney Goldin, Attorney DiDonato; and Fox Rothschild. Carmen Enterprises and Attorney Chasan accused them of engaging in unlawful civil procedures during **Carmen I**.

Murpenter, Mr. Carpenter, and Ms. Murphy filed no pleadings opposing the complaint. Carmen Enterprises took default judgments against them with damages to be determined at a future trial. At that point, this became a suit by Carmen Enterprises and Attorney Chasan against the Law Firm.

According to Carmen Enterprises and Attorney Chasan, the Law Firm's defensive tactics:

> were designed and intended to delay and/or to make the litigation so expensive and burdensome that [Carmen Enterprises] would be forced to withdraw and discontinue its meritorious complaint. As such, the [Law Firm] . . . had improper purposes. Some of the tactics the Defendants in this matter engaged in, in [**Carmen I**], included the following:
>
> > (a)    filing a baseless fraud counterclaim and baseless amended fraud counterclaim (which eventually was dismissed on summary judgment);
> >
> > (b)    filing a baseless counterclaim for conversion and a baseless amended counterclaim for conversion (dismissed on summary judgment);

- 18 -

(c)    filing a motion to disqualify Attorney Chasan on grounds that he was a necessary witness (said motion was denied);

(d)    filing a motion for partial summary judgment to hold Attorney Chasan ineligible for contractual attorney's fees (said motion was granted, but the order granting it was reversed on appeal);

(e)    filing a motion for leave to amend to add a baseless 4th counterclaim for alleged breach of contract (which the court granted, but Murpenter later agreed to dismiss the fourth counterclaim with prejudice rather than respond to discovery);

(f)    not responding to discovery which forced Carmen Enterprises to file multiple discovery motions;

(g)    not complying with discovery orders which forced Carmen Enterprises to file multiple motions for sanctions;

(h)    not making the sales files of Uniglobe Wings Travel available for audit, as required by the contract between Carmen Enterprises and Murpenter; and

(i)    filing a meritless bankruptcy petition for Murpenter on the eve of trial in order to obtain the automatic stay available under the U.S. Bankruptcy Code, and thus delay trial.

Second Amended Complaint at 11-12.

The Second Amended Complaint contained five counts. The first three counts alleged violations of the WUCPA against Murpenter, Mr. Carpenter, Ms. Murphy, and the Law Firm, based on Murpenter's counterclaims of (1) fraud, (2) conversion, and (3) breach of contract, respectively, in **Carmen I**. The fourth and fifth counts alleged that Murpenter filed its bankruptcy petition in **Murpenter I** on advice of Attorneys Goldin and DiDonato to delay Carmen

Enterprises' bench trial in **Carmen I**, which, according to Carmen Enterprises and Attorney Chasan, also violated the WUCPA.

The Law Firm filed several preliminary objections to the operative complaint, which the trial court assigned to Judge Leon Tucker. While the preliminary objections were pending, Carmen Enterprises and Attorney Chasan served the Law Firm with requests for production of documents. The Law Firm objected to producing the documents based on relevancy, attorney-client privilege, and the work-product rule. It asserted the second and third objections on behalf of the Law Firm's former clients (*i.e.*, Murpenter, Mr. Carpenter, and Ms. Murphy).

On February 2, 2022, Judge Tucker sustained the Law Firm's preliminary objection to Attorney Chasan's lack of standing and dismissed him from the litigation. Because Attorney Chasan was not a party to **Carmen I**, Judge Tucker determined that he could not bring a cause of action under the WUCPA. Judge Tucker also dismissed counts four and five with prejudice, based on federal preemption and ended Attorney DiDonato's role in this lawsuit.

Next, on April 12, 2022, Judge Tucker entered an order overruling most of the Law Firm's objections to Carmen Enterprises' motion for production of documents. However, he sustained an objection to producing Document No. 8, because Judge Tucker deemed that document to be irrelevant. **See** T.C.O., 4/12/22, at 1 n.3. In the April 12, 2022 Order, Judge Tucker made no ruling regarding the Law Firm's claims of attorney-client privilege or work product. Still, he added a sentence directing the Law Firm that, "in complying with this

ruling [*i.e.*, producing documents], any further objection on the basis of an alleged privilege by [the Law Firm] must include . . . either redactions or a privilege log." ***Id.*** at 1-2 (citing ***Fisher v. Erie Insurance Exchange***, 258 A.3d 451 (Pa. Super. 2021) (*en banc*)).

Discovery lasted for two years, during which, the Court of Common Pleas of Philadelphia County reassigned this matter to Judge Paula Patrick.

During discovery, the Law Firm produced two documents labeled as "FD001962" and "FD001963." These documents were copies of the Sixth Set of Interrogatories that the "Law Office of Ely Goldin" had faxed to someone on December 20, 2005, at 1:14 p.m. – *i.e.*, 36 minutes **before** the sanctions hearing in ***Carmen I***. December 20, 2005 Fax at 14-15. The fax did not identify its recipient. ***See id.***; ***see also*** N.T., 1/25/23, at 31 (Attorney Chasan stating, "I guess he sent it to the client, [but] I don't know.").

The fax had handwritten answers to the Interrogatories. It read, in relevant part, as follows:

> 26. Identify all employees or officers of Murpenter . . . who were involved in exporting or attempting to export the "Sales-01" file at 4:35 p.m. on November 2, 2001 from the MAIL directory of [Carmen Enterprises'] computer . . .
>
> RESPONSE (Use extra sheets if necessary):
>
> 1. THERESA VAUGN
> 2. DOUG CARPENTER
> 3.
>
> 27. Identify all employees or officers of Murpenter . . . who had custody of the data disk that was used to

- 21 -

export the "Sales-01" file at 4:35 p.m. on November 2, 2001 from the MAIL directory of [Carmen Enterprises'] computer . . .

RESPONSE (use Extra sheets if necessary):

1. DOUG CARPENTER

2. THERESA VAUGHn

**Id.**

Hence, the December 20, 2005 Fax appeared to Carmen Enterprises to provide it with the missing answers that it had sought in **Carmen I**. Attorney Chasan questioned Ms. Vaughan about the fax at her October 31, 2022 deposition.

Their exchange went as follows:

Q: Let me show you . . . a document from the [Law Firm's] production . . . FD001962, there's a response to Question 29 that says, "Unknown." . . . Do you recognize that handwriting?

A: . . . I would say it looks like Doug [Carpenter's] handwriting, but it's just one word, so I don't know.

Q: Okay. And, if you look at the second page of the exhibit . . . FD001963, the handwritten answer to Question 26 says, "Teresa Vaugn [*sic*] and Doug Carpenter." Do you recognize that handwriting?

A: Again, it looks like Doug Carpenter's handwriting and, yes, he did totally misspell my name.

Q: Yeah, I didn't think you would misspell your own name.

A: No . . .

Q: But, to the best of your knowledge, that looks like Doug Carpenter's handwriting?

A: It looks like it to me, yes.

Vaughan's Depo., 10/31/22, at 60-61. Attorney Chasan read Interrogatories 26 and 27 to Ms. Vaughan and asked if Mr. Carpenter had written his and her names as response to those Interrogatories. She replied, "It appears he has, yes." *Id.* at 62. When asked if the Interrogatories refreshed her recollection as to the list of customers' names and the events of November 2, 2002, Ms. Vaughan said, "***I did have the disk***, but, as far as I remember, I did nothing in any computer at [Carmen Enterprises' former office] to extract that." *Id.* (emphasis added).

Two days later, the Law Firm's counsel emailed Attorney Chasan and asked to retract the fax based on a claim that the "document is attorney-client privileged . . . ." November 2, 2022 Email from O'Connell to Chasan.

Attorney Chasan replied:

> The documents in question . . . are not privileged, because they are evidence of fraud on the court by Mr. Carpenter and [Attorney] Goldin in serving evasive discovery responses in [***Carmen I***]. As such, the crime-fraud exception to the attorney-client privilege comes into play. Further, the documents call into question the legitimacy of other assertions of the attorney-client privilege by the [Law Firm].

November 4, 2022 Email from Chasan to O'Connell. The Law Firm refused to concede that the attorney-client privilege did not apply to the documents.

As a result, on December 8, 2022, Carmen Enterprises moved the court to declare that the Law Firm could not retract the fax. Carmen Enterprises raised multiple arguments in support of its motion. It claimed:

- 23 -

> (1) the handwritten information on the [fax] comprised discoverable facts that cannot be deemed privileged, just because they were provided to counsel for the purpose of responding to interrogatories;
>
> (2) the [fax] disclosed fraud on the court in [**Carmen I**], thereby vitiating the attorney-client privilege and work-product doctrine, because of the crime-fraud exception;
>
> (3) . . . Murpenter ceased all operations in 2011 and filed a "no asset" Chapter 7 bankruptcy petition in 2012, and therefore it has no assets to protect and no one with a legitimate ability to claim attorney-client privilege; and
>
> (4) the circumstances of production of the documents amounted to a waiver of the privilege in any event.

Carmen Enterprises' December 8, 2022 Memorandum of Law in Support of Discovery Motion at 2.

Regarding the first of its four arguments (that attorney-client privilege and the work-product rule do not apply to the December 20, 2005 Fax), Carmen Enterprises argued that the "party asserting the privilege has the initial burden of showing facts establishing that the privilege is properly invoked." *Id.* at 4 (citing **Ford-Bey v. Professional Anesthesia Services of North America, LLC**, 229 A.3d 984, 991 (Pa. Super. 2020). The Law Firm "supplied a letter which purports to show that the attorney-client privilege and work-product rule apply to [the fax], and [they] are entitled to claw it back." *Id.* However, Carmen Enterprises refused to "concede that counsel's letter is adequate to meet the burden that the putative privilege holder must meet." *Id.*

The Law Firm filed a response to the discovery motion. It claimed, in contradiction to Ms. Vaughan's sworn deposition testimony, that Attorney "Goldin states that the handwriting on [the fax] are his own pre-hearing notes from" the day of the December 20, 2005 sanction hearing in *Carmen I*. Law Firm's December 22, 2022 Memorandum of Law in Opposition to Carmen Enterprises' Discovery Motion at 7. For this factual assertion, the Law Firm relied upon an unsworn, unnotarized, and unverified "Certification of Ely Goldin, Esq." attached to the Law Firm's Memorandum of Law as Exhibit F.

The Certification alleged as follows:

1. I am Ely Goldin, an attorney at law in . . . Pennsylvania who practices law at Fox Rothschild LLP.

2. I am familiar with the partial document Bates stamped FD 001962-63.

3. The handwriting on FD 001962-63 is my own and reflects my notes for a hearing held that day . . . in Montgomery County, Pennsylvania.

I CERTIFY that the forgoing statements made by me are true. I am aware that if any of the forgoing statement[s] made by me are willfully false, I am subject to punishment.

*Id.*, Ex. F, Certification of Ely Goldin, Esq. at 1. The Law Firm argued that, because the handwriting on the fax was Attorney Goldin's notes, the fax met the definition of "attorney-client privilege or [fell] under the work-product doctrine." *Id.* at 9. The Law Firm even characterized the handwriting as "Goldin's recollections of client interviews and deposition issues," even though Exhibit F made no such factual claim. *Id.*

On January 25, 2023, Judge Patrick convened what was intended to be an evidentiary hearing on Carmen Enterprises' discovery motion. However, the Law Firm called no witnesses and offered no exhibits to establish whose handwriting was on the fax. Mr. Carpenter did not attend the hearing, because his wife was having surgery. Nothing in the transcript indicates why Attorney Goldin neglected to testify regarding the factual allegations in the Certification. Instead, the Law Firm spent the entire hearing arguing that Murpenter was a functioning corporation that could assert attorney-client privilege and that the fax was not evidence of fraud upon the Court of Common Pleas of Montgomery County.

On February 1, 2023, the trial court denied Carmen Enterprises' motion to prevent the Law Firm from retracting the fax. Notably, the trial court also neglected to consider and address whether attorney-client privilege or the work-product rule protected the fax. Presumably, this was due to the fact that the Law Firm neglected to prove and argue that the fax was a document to which the privilege or doctrine applied. Instead, the court simply assumed that the fax was entitled to attorney-client privilege or work-product-doctrine protection. **See** T.C.O., 2/1/23, at 1-2 (failing to analyze whether the fax was a privileged communication or work product). Hence, the trial court addressed arguments two, three, and four in Carmen Enterprises' Memorandum of Law, but not its first argument that the Law Firm offered insufficient evidence to prove that attorney-client privilege or the work-product rule applied.

The following year, on May 20, 2024, the Law Firm moved for summary judgment on all counts. According to the Law Firm, it had probable cause, as that term is defined in the WUCPA, to bring the counterclaims against Carmen Enterprises. In addition, the Law Firm, relying on federal cases applying the WUCPA, asserted that, if it had probable cause to maintain even a single counterclaim, then Carmen Enterprises' entire action under the WUCPA must be dismissed, as a matter of law.

Carmen Enterprises responded that there was a host of genuine issues of material facts for a jury, including whether the Law Firm's expert witness was credible. In addition, Carmen Enterprises indicated that it had ample evidence to permit a jury to infer that the counterclaims were brought to delay **Carmen I** and add to Carmen Enterprises' litigation costs, rather than to secure a just result based on colorable allegations. Finally, Carmen Enterprises challenged the Law Firm's interpretation of the WUCPA. In Carmen Enterprises' view, even if the Law Firm had probable cause to bring and maintain one or more counterclaims, the WUCPA still barred it from bringing or maintaining other frivolous counterclaims. Thus, Carmen Enterprises asked the trial court to reject the federal courts' interpretation of the Pennsylvania statute.

Judge Patrick granted the Law Firm's motion. Carmen Enterprises discontinued this action as to Murpenter, Mr. Carpenter, and Ms. Murphy,

despite already having taken default judgments against them.[3]   This timely appeal followed.

## III.  Analysis

Carmen Enterprises and Attorney Chasan raise a combined total of four issues which we have reordered as follows:

1.  Did the trial court err by sustaining the preliminary objections to Attorney Chasan's standing?

2.  Did the trial court err in discovery orders allowing the Law Firm to assert the attorney-client privilege on behalf of Murpenter?

3.  Did the trial court err by denying Carmen Enterprises' Motion to Overrule Defense Clawback of the fax in discovery?

4.  Did the trial court err by misapplying the summary-judgment standard and deciding disputed issues of fact rather than deciding whether there are factual issues to be tried?

Carmen Enterprises & Chasan's Brief at 3-4 (cleaned up).

*A.    Standing*

First, Attorney Chasan argues that Judge Tucker erred by sustaining the Law Firm's preliminary objection based on his lack of standing under the WUCPA.   He claims that the trial court improperly relied upon ***Rosen v. American Bank of Rolla***, 627 A.2d 190, 193 (Pa. Super. 1993), to rule that he was  "not a party in interest."  Carmen Enterprises & Chasan's Brief at 70. Attorney Chasan instead contends that ***Hart v. O'Malley***, 676 A.2d 222 (Pa.

_____

[3] We amended the caption to reflect that discontinuance and the preemption demurrer as to Attorney DiDonato.

1996), controls this case, because the **Hart** Court interpreted the WUCPA to grant standing to persons who have a "substantial interest" in the prior action, even if they were not a named party therein. Carmen Enterprises & Chasan's Brief at 72.

Attorney Chasan believes that the counterclaims in **Carmen I** directly targeted him, creating potential personal liability and causing reputational damage to his fitness to practice law. Furthermore, Attorney Chasan asserts that, as the principal attorney with a contractual stake in the award of attorneys' fees and costs in **Carmen I**, he possessed a direct pecuniary interest, making him a *de facto* counterclaim-defendant, rather than a mere witness. Lastly, Attorney Chasan offers the dissenting opinion of Chief Justice Saylor in **Raynor v. D'Annunzio**, 243 A.3d 41 (Pa. 2020), for the proposition that the impact of sanctions upon an attorney in a prior action should be deemed severe enough to give the attorney standing to bring a WUCPA claim. Carmen Enterprises & Chasan's Brief at 74.

The question of whether a petitioner has standing "presents a question of law, over which our standard of review is *de novo*, and our scope of review is plenary." **Pennsylvania State Education Assoc. v. Public Schools Employees' Retirement Bd.**, 311 A.3d 1017, 1028 (Pa. 2024). "[W]e will affirm an order sustaining preliminary objections based on standing only if the plaintiff is clearly not entitled to relief as a matter of law." **Firearm Owners Against Crime v. Papenfuse**, 261 A.3d 467, 476 (Pa. 2021).

"Standing requires a party to have a substantial interest in the subject matter of the litigation; the interest must be direct; and the interest must be immediate and not a remote consequence. The inquiry into standing ascertains whether a party is the proper party entitled to make the legal challenge to the matter involved." **In re Raymond G. Perelman Charitable Remainder Unitrust**, 113 A.3d 296, 302 (Pa. Super. 2015). In other words, a preliminary objection based on lack of standing claims that a plaintiff cannot maintain his alleged cause of action, as a matter of law.

Because this issue arises as a preliminary objection to the complaint, our scope of review is confined to the four corners of the Second Amended Complaint. We must "accept as true all well-pleaded material facts set forth in the appellant's complaint and all reasonable inferences which may be drawn [in the appellant's favor] from those facts." **Ellenbogen v. PNC Bank, N.A.**, 731 A.2d 175, 181 (Pa. Super. 1999). Our standard of review is *de novo*. **See id.**

In 1970, the General Assembly of Pennsylvania adopted the WUCPA, which replaced the common-law tort of abuse of process with a statutory scheme. Under the statute:

> A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings [when]:
>
> (1)    he acts in a grossly negligent manner or without probable cause and primarily for a purpose other than . . . securing the proper discovery, joinder of

> > parties or adjudication of the claim in which the proceedings are based; and
>
> > (2)   the proceedings have terminated in favor of the person against whom they are brought.

42 Pa.C.S.A. § 8351(a).

In his complaint, Attorney Chasan alleged Murpenter, Mr. Carpenter, Ms. Murphy, and the Law Firm wrongfully initiated and continued to prosecute counterclaims against Carmen Enterprises for fraud and conversion in ***Carmen I***.  Attorney Chasan was not a party to ***Carmen I***.  Hence, he was not "the other" person "against whom [Murpenter] brought" the at issue counterclaims.  ***Id.***  Based on that plain language, the trial court sustained the Law Firm's preliminary objection that Attorney Chasan has no standing under the WUCPA to be a plaintiff in this suit.

Attorney Chasan asks us to expand the scope of the WUCPA to grant him standing, because the counterclaim of fraud allegedly impugned his good name and reputation as a lawyer.  He also contends that he is the "real party in interest" as the majority shareholder of Carmen Enterprises, particularly because the bulk of the judgment entered in ***Carmen I*** is for his attorney's fees as Carmen Enterprises' legal counsel.

This argument fails, because the WUCPA provides that, if Carmen Enterprises wins this new case, then it is entitled to an award of the legal fees that Carmen Enterprises accrued in ***Carmen I***.  "When the essential elements of an action brought pursuant to this subchapter have been established . . . , the plaintiff is entitled to recover . . . the expense, including any reasonable

attorney fees, that he has reasonably incurred in defending himself against the [prior] proceedings." 42 Pa.C.S.A. § 8353(3). Therefore, Attorney Chasan's presence as a co-plaintiff in this action is clearly redundant.

He cannot establish an additional basis for recovery under the WUCPA beyond what Carmen Enterprises can recover of his attorney's fees in **Carmen I**, if Carmen Enterprises is victorious here. Admittedly, the Act allows a person to recover for the loss of reputation a frivolous civil proceeding might have inflicted upon it. **See** 42 Pa.C.S.A. § 8353(2). But Attorney Chasan points to no allegation in the operative complaint that he, in fact, suffered a pecuniary loss to his reputation as a lawyer due to the counterclaims that Murpenter (and, by extension, the Law Firm) brought against Carmen Enterprises. Thus, the case of **Hart**, **supra**, does not apply to him.

In **Hart**, the third-party plaintiffs, to whom the Supreme Court extended WUCPA standing, actually suffered a direct pecuniary loss from the underlying proceeding, even though they were not a party to it. Here, by contrast, any loss that Attorney Chasan may suffer is derivative of Carmen Enterprises' ability to recover its legal fees from the Law Firm. If the Law Firm did not violate the WUCPA relative to Carmen Enterprises, then it clearly did not violate the WUCPA relative to Attorney Chasan, and he would not be entitled to collect anything from the Law Firm. And, if the Law Firm violated the WUCPA relative to Carmen Enterprises, then Attorney Chasan will be able to recover his fees and costs from Carmen Enterprises. In either scenario,

Attorney Chasan's claim to damages is coterminous to the harm that Carmen Enterprises can plead and prove.

Granted, in **Carmen I**, Murpenter incorrectly alleged Attorney Chasan was the agent of Carmen Enterprises who comitted fraud and conversion. Even so, Attorney Chasan would still need to plead that there was an actual harm to his reputation to recover under the WUCPA. Attorney Chasan alleged no such reputational harm and damages in the operative complaint.

Hence, the trial court correctly ruled that Attorney Chasan is not "a person" who prevailed in **Carmen I**. Having suffered no actual harm from the counterclaims, Attorney Chasan lacks standing under the WUCPA. Thus, we dismiss his appellate issue as meritless and turn to the three issues of Carmen Enterprises.

B.      *The April 12, 2022 Discovery Order*

As its first issue, Carmen Enterprises claims that, in Judge Tucker's April 12, 2022 Discovery Order, he rejected its argument that the Law Firm could not invoke attorney-client privilege and the work-product rule on behalf of Murpenter. It bases that claim on a single sentence in the order reminding the Law Firm to provide a privilege log for any future assertions of privilege or work product. Carmen Enterprises argues, because Murpenter has no assets or ongoing business, Murpenter is "dead." Carmen Enterprises asserts that, under our precedents, a "dead" company has no surviving privileges for its former attorney or law firm to assert.

In the trial court's Rule 1925(a) Opinion, Judge Patrick indicates that Judge Tucker's order should remain undisturbed on appeal. She observes that Carmen Enterprises suffered no harm from the sentence that Judge Tucker added to the April 12, 2022 Order, concerning future claims of attorney-client privilege and the requirement of privilege logs in **Fisher**, **supra**. **See** Trial Court Opinion, 7/15/25, at 19. Instead, Judge Patrick notes that Judge Tucker did not rule that attorney-client privilege shielded Document 8 from production; instead, he ruled that Document 8 was irrelevant. As a result, in Judge Patrick's opinion, Carmen Enterprises' failure to challenge the basis of Judge Tucker's decision to deny production of Document 8 (*i.e.*, relevancy), deprives this Court of any grounds from which to overturn Judge Tucker's order. **See id.** She is correct.

On appeal, Carmen Enterprises does not claim that Judge Tucker abused his discretion by ruling Document No. 8 irrelevant. Therefore, whether Murpenter has a surviving privilege for the Law Firm to invoke has no bearing on the order under review. Even if we agreed with Carmen Enterprises' arguments concerning privilege, we would have no reason to reverse the April 12, 2022 Order, because the trial court's irrelevancy ruling would remain undisturbed. Hence, Murpenter's ongoing right to assert attorney-client privilege (or lack thereof) is moot regarding the April 12, 2022 Order.

Typically, courts will not decide a moot issue, "because the law requires the existence of an actual controversy, **In re Gross**, 382 A.2d 116, 119 (Pa. 1978), . . . [but] we have reviewed moot matters, IN OUR DISCRETION, WHEN

THE ISSUE presented is one of great public importance or is one that is capable of repetition yet evading review." ***Assoc. of Pennsylvania State College & University Faculties v. P.L.R.B.***, 8 A.3d 300, 305 (Pa. 2010). Carmen Enterprises does not contend that either exception to the mootness doctrine applies to the single sentence in the April 12, 2022 Order concerning **future** privilege logs.[4]

Because the sentence in the April 12, 2022 Order is not grounds for reversal, we dismiss Carmen Enterprises' first appellate issue as moot.

C.    *The February 1, 2023 Order Permitting Clawback of the Fax*

Next, Carmen Enterprises contends the trial court erroneously allowed the Law Firm to clawback the December 20, 2005 Fax during discovery.

1.    <u>The Parties' Arguments</u>

Carmen Enterprises asserts that the fax is a list of names that Murpenter and the Law Firm should have produced in discovery during **Carmen I**, rather than being legal advice subject to attorney-client privilege.  It also claims that recording these names was a procedural act, rather than attorney-work product, and that the Law Firm failed to meet its burden of proof on the existence of privilege or the work-product exception.  Carmen Enterprises asserts that Judge Patrick failed to address its argument that the fax did not constitute a privileged, attorney-client communication or an attorney's work

---

[4] In fact, when viewed in the totality of the order, the sentence on future privilege logs was *orbiter dicta*, because it did not dispose of any issue before the trial court.  The sentence was a word of caution to the Law Firm regarding future document production and yet-to-be-asserted claims of privilege.

product. Furthermore, it believes that the clawback attempt violated the Law Firm's duties of candor to the court. **See** Carmen Enterprises and Chasan's Brief at 83 (citing Pennsylvania Rules of Professional Conduct Governing Lawyers 3.3, 3.4).

In addition, Carmen Enterprises contends that Judge Patrick misapplied **Red Vision Systems, Inc. v. National Real Estate Info. Services, L.P.**, 108 A.3d 54, 56 (Pa. Super. 2015), because Murpenter ceased operations and lacked authorized management for a windup. Thus, in Carmen Enterprises' view, Murpenter had no attorney-client privilege for the Law Firm to assert.

The final portion of Carmen Enterprises' argument contends that the fax may be used to impeach Mr. Carpenter and Attorney Goldin. **See** Carmen Enterprises and Chasan's Brief at 88. It claims that the fax proves a "fraud on the court," because Attorney Goldin deceptively avoided answering Interrogatories 26 and 27 in **Carmen I**. Carmen Enterprises suggests that Judge Patrick improperly analyzed the issue under the "crime-fraud exception," rather than as "fraud on the court." **Id.** at 89 (citing Trial Court Opinion, 7/15/25, at 24-26).

The Law Firm responds that Judge Patrick correctly applied attorney-client privilege and the work-product rule in favor of Murpenter. In its view, Carmen Enterprises' argument rests on a misinterpretation of **Red Vision**. **See** Law Firm's Brief at 56. It claims Murpenter has living principals – *i.e.*, Mr. Carpenter and Ms. Murphy – who can assert a privilege, and there is no evidence Murpenter formally dissolved under Pennsylvania law. The Law Firm

suggests that, under **Red Vision**, a business entity's privilege survives cessation of business, if it retains some existence through its management.

Further, the Law Firm maintains that the fax is work product. **See id.** at 59-60. According to the Law Firm, the fax contains Attorney Goldin's handwritten notes made prior to the December 20, 2005 sanctions hearing in **Carmen I**. **See id.** at 58.

Also, the Law Firm disputes that there was a fraud on the court. It contends that the notes are consistent with Attorney Goldin's December 27, 2005 letter to Judge O'Neill, which, the Law Firm claims, disclosed the relevant names and deposition locations. Finally, the Law Firm argues that the trial court properly analyzed Carmen Enterprises' allegations under the crime-fraud exception and found it inapplicable.

2. <u>Our Standard of Review, the Statute, & the Rule</u>

Issues regarding the "application of the attorney-client privilege are questions of law. Accordingly, our standard of review is *de novo*, and our scope of review is plenary." **Pittsburgh History & Landmarks Foundation v. Ziegler**, 200 A.3d 58, 80 n.26 (Pa. 2019).

In Pennsylvania, the attorney-client privilege is statutory. "In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client . . . ." 42 Pa.C.S.A. § 5928.

Similarly, the Supreme Court of Pennsylvania has codified the work-product doctrine in the Rules of Civil Procedure. The scope of discoverable documents under those Rules is broad. A "party may obtain discovery of any

matter discoverable under Rule 4003.1 even though prepared in anticipation of litigation or trial by or for another party or by or for that other party's representative, including his or her attorney . . . ." Pa.R.Civ.P. 4003.3. But the scope of discovery bars "disclosure of the mental impressions of a party's attorney or his or her conclusions, opinions, memoranda, notes or summaries, legal research or legal theories." *Id.*

The party asserting that the privilege or work-product rule prevents the production of evidence bears the initial burden of production and proof on the threshold question of whether the privilege or doctrine applies. *See King v. Kappa Sigma Fraternity*, 331 A.3d 695, 700 (Pa. Super. 2025), *reargument denied* (2025). Critically, the "[a]ttorney-client privilege is *not automatic*; it must be invoked successfully by satisfaction of a four-element test." *Knopick v. Boyle*, 189 A.3d 432, 439 (Pa. Super. 2018) (emphasis added). If "the party asserting the privilege does not produce sufficient facts to show that the privilege was properly invoked, then the burden never shifts to the other party, and the communication is not protected under attorney-client privilege." *Id.*

The four elements that a court must analyze before determining that attorney-client privilege shields the production of evidence are:

1) The asserted holder of the privilege is or sought to become a client.

2) The person to whom the communication was made is a member of the bar of a court, or his subordinate.

> 3) The communication relates to a fact of which the attorney was informed by his client, without the presence of strangers, for the purpose of securing either an opinion of law, legal services or assistance in a legal matter, and not for the purpose of committing a crime or tort.
>
> 4) The privilege has been claimed and is not waived by the client.

*Id.*

### 3. The Trial Court's Error & Law Firm's Lack of Proof

Here, the trial court erred, because it presumed the Law Firm's claim of the attorney-client privilege or work-product protection was true without testing the Law Firm's premises. As Carmen Enterprises correctly argues, the court neglected to analyze the threshold issue of whether the fax actually contained a privileged communication or was an attorney's work product. *See* T.C.O., 2/1/23, at 1-2. Indeed, the trial court never ruled whether it was denying Carmen Enterprises' discovery motion, because either the attorney-client privilege or the work-product rule applied to the fax. By skipping directly to the secondary issue of whether Murpenter lost the privilege or work-product protection, the trial court prematurely shifted the burden of proof onto Carmen Enterprises. *See Knopick*, *supra*.

During the January 25, 2023 hearing on Carmen Enterprises' motion to prevent the Law Firm from retracting the December 20, 2005 Fax, the Law Firm called no witnesses and offered no exhibits into evidence that supported its claim that attorney-client privilege or work-product rule applied. Thus, on that basis alone, the Law Firm failed to meet its burden of production and

persuasion to establish that either the privilege or work-product rule applied to the fax.

Additionally, the unsworn, unnotarized, and unverified "Certification," purportedly of Attorney Goldin, attached to the Law Firm's memorandum of law, was legally insufficient to prove that the December 5, 2005 Fax was a privileged communication or work product. Under the Uniform Unsworn Declarations Act, "if a law of this Commonwealth requires or permits use of a sworn declaration, an unsworn declaration meeting the requirements of this chapter has the same effect as a sworn declaration." 42 Pa.C.S.A. § 6204; *See also* Pa.R.Civ.P. 76 (defining "affidavit" as including "a statement in writing of a fact or facts, signed by the person making it, that . . . is unsworn and contains a statement that it is made subject to the penalties of 18 Pa.C.S.A. § 4904 . . . ."). An "unsworn declaration" is defined as "a declaration in a signed record not given under oath but *given under penalty of perjury.*" 42 Pa.C.S.A. § 6202 (emphasis added).

An unsworn declaration *must include* the following words in order for an unsworn statement to be competent evidence:

> I declare under penalty of perjury under the law of the Commonwealth of Pennsylvania that the foregoing is true and correct.
>
> Signed on the.....day of………….. at …………………………, (date).....(month)…….(year)…….(county or other location, and state)………………………………………………..………………., (country)……………………………………………………………..
>
> (printed name)……………………………………………………………

(signature)…………………………………………………………………………………….

42 Pa.C.S.A. § 6206.

Here, the "Certification," alleging that Attorney Goldin's handwriting is on the December 20, 2005 Fax, did not meet the demands of the Uniform Unsworn Declarations Act. Absent from the "Certification" is a declaration that the author made the statements "under penalty of perjury under the laws of the Commonwealth of Pennsylvania." *Id.* Instead, the author only "certified" that the author was "aware that if any of the forgoing statement[s] made by me are willfully false, I am subject to punishment." Law Firm's Memorandum of Law in Opposition to Carmen Enterprises' Discovery Motion Ex. F at 1. The document is therefore in derogation of 42 Pa.C.S.A. § 6202.

As a result, the document titled, "Certification of Ely Goldin, Esq.," is not competent evidence of record. To the extent that the trial court relied upon the "Certification" as evidence that the fax was privileged or work product, the trial court erred. Therefore, it erroneously denied Carmen Enterprises' motion to prevent the Law Firm from clawing back the fax.[5]

---

[5] Carmen Enterprises' discovery motion also requested a decree that the Law Firm could not assert privileges or the work-product rule on behalf of Murpenter, because Carmen Enterprises believes it is a "dead" company. Given that the Law Firm did not meet its initial burden of proof on attorney-client privilege and the work-product rule regarding the December 20, 2005 Fax, we need not consider whether Murpenter is a "dead" company under *Red Vision Systems, Inc. v. National Real Estate Info. Services, L.P.*, 108 A.3d 54, 56 (Pa. Super. 2015); whether the trial court misapplied the crime-fraud exception; whether there was a fraud upon the Court of Common Pleas of Montgomery County; or whether the Law Firm waived the privilege/work-product rule by accidentally producing the fax in this lawsuit. We dismiss those claims of error as moot for purpose of this appeal.

*D.* *Summary Judgment*

Lastly, Carmen Enterprises challenges the trial court's grant of summary judgment to the Law Firm and dismissal of counts one and two in the operative complaint.

1.    The Parties' Arguments

Carmen Enterprises argues that the trial court misapplied the standard of review for summary judgment by resolving factual and credibility issues instead of determining whether issues of fact existed.  According to Carmen Enterprises, the court failed to view the evidence in the light most favorable to it (the non-moving party) and disregarded documentary, deposition, and expert evidence supporting its claims under the WUCPA.

With respect to the counterclaim of fraud, Carmen Enterprises contends that, even if Attorney Goldin initially believed Mr. Carpenter's claim that Murpenter received fewer than 1,900 customers' names, any probable cause dissipated once Carmen Enterprises presented Attorney Goldin with overwhelming contrary evidence during discovery in 2002.  It emphasizes that Attorney Chasan sent multiple letters explaining that Murpenter received a disk with 1,915 customers' names.  Thus, Murpenter's fraud theory rested on the fact that all of the 1,915 names were not on the CruiseWeb disk, a disk which Carmen Enterprises did not supply to Murpenter.  Hence, Carmen Enterprises never represented to Murpenter that all 1,915 names were on the CruiseWeb disk.

It also indicates that, during Attorney Goldin's deposition, he admitted to receiving Carmen Enterprises' explanatory letters regarding the whereabouts of the 1,915 names and that Murpenter's personnel created the CruiseWeb disk. Carmen Enterprises contends this is sufficient evidence to establish that Murpenter never had proof of a false statement, *i.e.*, an essential element of fraud. It argues that, under the WUCPA, liability may arise not only from filing a counterclaim without probable cause, but also from the continuation of a meritless counterclaim. In its view, whether Attorney Goldin acted with either gross negligence or willful blindness when he elected to continue prosecuting the counterclaim of fraud, in the face of overwhelming contrary evidence, is a jury question.

Furthermore, Carmen Enterprises maintains that the trial court erred by ignoring or discounting the expert report of Steven Angstreich, Esq. Attorney Angstreich opined that Attorney Goldin lacked probable cause, acted with gross negligence, and pursued the counterclaim of fraud for improper reasons. Carmen Enterprises asserts that, for purposes of the Law Firm's motion for summary judgment, the trial court was required to accept its expert's report as true, because it was the non-moving party.

Carmen Enterprises also challenges the trial court's reliance upon comments that Judge Haaz made during the bench trial in ***Carmen I***. It believes Judge Haaz's comments were non-binding *dicta*, because they were not essential to the issues in that trial. Moreover, his comments did not address probable cause under the WUCPA for a counterclaim of fraud and,

therefore, Carmen Enterprises claims that Judge Haaz's statements cannot be deemed as *res judicata* or collateral estoppel in this case.

Additionally, Carmen Enterprises contends that, even if it had failed to provide Murpenter with 1,915 customers' names in 2001, there was still no legal basis to bring a counterclaim of fraud. It observes that such a factual scenario is grounds to bring a counterclaim for breach of contract, not for the tort of fraud.

Regarding Murpenter's counterclaim of conversion, Carmen Enterprises argues that the trial court again improperly resolved disputed issues and ignored Murpenter's absence of evidence to support the elements of conversion. It asserts that, when Attorney Chasan photocopied an employee's manual, he did not deprive Murpenter of possession or interfere with Murpenter's use of the chattel in any way. Carmen Enterprises emphasizes that Murpenter admitted it could not identify any damage to the manual (much less its total destruction), Attorney Goldin conceded that he never determined what damages occurred to the manual, and no evidence of damages was produced in **Carmen I**.

The Law Firm replies that the undisputed record establishes that, as a matter of law, probable cause existed for Attorney Goldin to file Murpenter's counterclaims of fraud and conversion. The Law Firm believes that probable cause negates any showing of gross negligence by Attorney Chasan under the WUCPA. It contends Carmen Enterprises' argument improperly conflates the

merits of the counterclaims in **Carmen I** with the lesser standard for probable cause.

According to the Law Firm, the WUCPA imposes a heavy burden on a plaintiff. It indicates that the statute requires proof that a defendant initiated or continued civil proceedings without probable cause or in a grossly negligent manner, primarily for an improper purpose, and that the proceedings terminated favorably to the plaintiff. The Law Firm stresses that, even if a plaintiff alleges gross negligence, the WUCPA still requires proof that the defendant lacked probable cause.

With respect to the counterclaim of fraud, the Law Firm argues that probable cause existed at the time the counterclaim was filed, because Murpenter reasonably believed it had received fewer than the promised 1,900 customers' names. The Law Firm recounts that Murpenter purchased Carmen Enterprises' customer-mailing list as a primary asset, complained shortly after closing that Carmen Enterprises had not delivered the list, received a disk and software from Carmen Enterprises, and tasked Ms. Vaughan with accessing the list. However, she used the wrong disk (CruiseWeb) and therefore only found 1,200 names. Also, the Law Firm claims that Attorney Goldin was unable to locate a list of more than 1,900 names when he reviewed the evidence. The Law Firm argues that these facts provided a reasonable basis for alleging fraud in the inducement, regardless of whether the allegation was correct.

The Law Firm chiefly relies on a statement from the bench during the trial in **Carmen I**. Judge Haaz said, in his view, Murpenter made a mistake in believing that Carmen Enterprises had only provided it 1,200 names. The Law Firm claims that statement establishes that Murpenter's conduct was not vexatious litigation.

As for the argument that probable cause dissipated over time, the Law Firm answers that Attorney Goldin was entitled to rely in good faith on his clients' statements and investigation. It also notes that the counterclaim of fraud survived Carmen Enterprises' first motion for summary judgment. The Law Firm believes that this evidence weighs strongly in favor of a finding that probable cause existed, even though the court in **Carmen I** dismissed the counterclaim on a renewed motion for summary judgment.

The Law Firm also disputes Carmen Enterprises' reliance on Attorney Angstreich's expert testimony. It asserts that the trial court considered the expert report and concluded that his opinion does not create a jury issue on probable cause. The Law Firm believes that the issue of probable cause is a pure question of law for the court.

Regarding the counterclaim of conversion, the Law Firm contends that probable cause was clearly established. It points to Carmen Enterprises' written admission that Attorney Chasan took and photocopied Murpenter's employee manual without permission, as well as his testimony admitting that he knew the manual was not Carmen Enterprises' property. The Law Firm also rejects any suggestion of gross negligence in bringing the counterclaim

of conversion, because, in its view, filing a counterclaim based on a written admission of unauthorized copying is not the absence of scant care.

Finally, the Law Firm suggests that the WUCPA "does not . . . allow a plaintiff to pick apart and single out a cause of action from a larger case in order to bring a claim . . . Instead, it focuses liability on the **_proceedings_** as a whole." Law Firm's Brief at 49 (emphasis in original). According to the Law Firm, Carmen Enterprises settled a counterclaim for breach of contract with Murpenter in **_Carmen I_**. Also, the Law Firm and Attorney Chasan agreed that Carmen Enterprises "waived any right to a [WUPCA] claim on [Murpenter's] third counterclaim [for setoff] because of the passage of time[.]" **_Id._** at 51 (quoting Chasan's Depo., 9/12/23, at 258-59). The Law Firm also notes that Carmen Enterprises "elected not to appeal the dismissal of Count III, related to [Murpenter's] unfiled breach-of-contract counterclaim, [thereby] waiving the issue." **_Id._** n.8.

To support this proposition, the Law Firm cites exclusively to decisions of federal district courts and the United States Court of Appeals for the Third Circuit. It contends, because Carmen Enterprises "cannot now challenge whether the setoff counterclaim was supported by probable cause, [under federal precedent,] its entire [WUCPA] cause of action is deficient." **_Id._** at 51.

Furthermore, the Law Firm argues that Carmen Enterprises cannot base WUPCA liability on Murpenter's counterclaim for breach of contract. The Law Firm believes Carmen Enterprises settled a counterclaim for breach of contract with Murpenter in exchange for Carmen Enterprises withdrawing a motion for

sanctions.  According to the Law Firm, "by settling the breach-of-contract counterclaim before [Murpenter filed it, Carmen Enterprises] gave [that counterclaim] probable cause, [and] there can be no lack of probable cause for the counterclaims as a whole under ***Bobrick Corp. [v. Santana Products, Inc.***, 698 F. Supp. 2d 479 (M.D. Pa. 2010), *aff'd*, 422 F. App'x 84 (3d Cir. 2011)]."  Law Firm's Brief at 53.

### 2. Our Standard of Review & the WUCPA

When reviewing an order granting summary judgment "our standard of review is *de novo,* and our scope of review is plenary."  ***LJL Transp., Inc. v. Pilot Air Freight Corp.***, 962 A.2d 639, 647 (Pa. 2009).  "We examine . . . all pleadings, . . . depositions, answers to interrogatories, admissions, affidavits, and expert reports, in [the] light most favorable to the non-moving party, and we resolve all doubts as to the existence of a genuine issue of material fact against the moving party."  ***Id.***

We may only affirm an order granting summary judgment if the non-moving party's right to judgment as a matter of law is "clear and free from doubt."  ***Id.***  If a "genuine issue of any material fact exists as to a necessary element of the cause of action," then summary judgment was inappropriate, and this Court must reverse the order.  ***Id.***

We turn to the Statutory Construction Act to interpret and apply the WUCPA.  "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly."  1 Pa.C.S.A. § 1921(a).  "When the words of a statute are clear and free from all ambiguity,

the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(b).

Under the WUCPA, a person is liable for wrongful use of civil proceedings if the person "takes part in the . . . continuation of civil proceedings against another . . . in a grossly negligent manner or without probable cause . . . and . . . the proceedings have terminated in favor of the person against whom they are brought." 42 Pa.C.S.A. § 8351(a). The "filing of a counterclaim may well constitute the 'continuation' of a civil proceeding and . . . the harm intended to be prevented by the statute may also arise from the filing of a counterclaim for improper purposes." ***Mi-Lor, Inc. v. DiPentino***, 654 A.2d 1156, 1158 (Pa. Super. 1995).

The elements to make a wrongful-use-of-civil-proceedings *prima facie* case, based on a counterclaim, are as follows:

> (1) The defendant . . . continued the civil proceedings against [the counterclaim defendant in the underlying action].
>
> (2) The [underlying] proceedings were terminated in [the WUCPA plaintiff's] favor.
>
> (3) The defendant did not have probable cause for his action.
>
> (4) The primary purpose for which the proceedings were brought was not that of securing the proper discovery, joinder of parties or adjudication of the claim on which the proceedings were based.
>
> (5) The plaintiff suffered damages as set forth in section 8353 (relating to damages).

42 Pa.C.S.A. § 8354.

Here, the parties agree that Carmen Enterprises produced sufficient evidence to establish the first, second, and fifth elements of Section 8354. Their disagreement is over the third and fourth elements. We must therefore determine whether Carmen Enterprises produced sufficient evidence to prove that Attorney Goldin lacked probable cause for his actions in ***Carmen I*** and that he filed the counterclaims for a primary purpose other than "securing the proper discovery, joinder of parties, or adjudication of the claim on which the proceedings were based." ***Id.***

The WUCPA defines "probable cause." The Law Firm had probable cause to file and continue to prosecute the counterclaims, if Attorney Goldin "reasonably believe[d] in the existence of the facts upon which the claim [was] based, and . . . reasonably believe[d] that under those facts the claim may [have been] valid under the existing or developing law . . . or[,] believe[d] as an attorney of record, in good faith that his . . . continuation of a civil cause [was] not intended to merely harass or maliciously injure the opposite party." 42 Pa.C.S.A. § 8352.

A plaintiff in a WUCPA action "need not obtain the defendant's outright confession of improper purpose; an improper purpose may be inferred where the [counterclaims are] filed without justification." ***Perelman v. Perelman***, 125 A.3d 1259, 1264 (Pa. Super. 2015) (some punctuation omitted). Thus, a WUCPA claim "will lie if ***the trier of fact*** could reasonably conclude that the defendant initiated [or continued] the underlying lawsuit without probable cause." ***Id.*** (emphasis added). In other words, probable cause in the WUCPA

is not a pure question of law for the court, as the Law Firm contends.  Instead, whether there was probable cause in a WUCPA action is a question of fact for the jury.  As we explain, there is legally sufficient evidence to ask a jury whether Attorney Goldin lacked probable cause in *Carmen I*.

     3.    The Counterclaim of Fraud

In *Carmen I*, even under the facts as Murpenter misunderstood them in 2001 and 2002, Attorney Goldin knew or should have known Murpenter's "facts" did not constitute the common-law tort of fraud.

To maintain a counterclaim of fraud, Murpenter needed to plead and to prove that Carmen Enterprises (1) knowingly or recklessly made (2) a material misrepresentation, (3) with intent to mislead Murpenter into relying on the misrepresentation, (4) Murpenter justifiably relied on the misrepresentation, and (5) that Murpenter suffered resultant damages.  *See Kit v. Mitchell*, 771 A.2d 814, 819 (Pa. Super. 2001).  The facts, as alleged in Murpenter's First Amended New Matter Counterclaim, did not satisfy those elements.

In drafting Murpenter's counterclaim of fraud, Attorney Goldin did not allege a precontract misrepresentation by Carmen Enterprises as the basis for the fraud counterclaim.  Rather, he cited to the language in the parties' Agreement, wherein Carmen Enterprises promised to provide Murpenter with over 1,900 customers' names and contact information, as the sole basis for Carmen Enterprises' alleged duty.  *See* Murpenter's First Amended New Matter Counterclaim in *Carmen I* at 2.  The only representation that Attorney Goldin attributed to Carmen Enterprises in the counterclaim of fraud was "that the

- 51 -

list contained names, addresses, telephone numbers and e-mail addresses for customers of [Carmen Enterprises] and that the list had substantial value, since customers who already did business with [Carmen Enterprises] would be receptive to Murpenter's marketing and advertising efforts." *Id.* But those representations were true; hence, those were not misrepresentations at all.

Attorney Goldin further alleged Carmen Enterprises actually provided Murpenter with a valuable list of customers' names and contact information. *See id.* This further defeats any claim or inference that it misled Murpenter. Even so, the number of names that Murpenter believed Carmen Enterprises provided to it was "35% fewer customers than [Carmen Enterprises] had promised to provide *under the Agreement*." *Id.* (emphasis added). Attorney Goldin alleged that, "[a]s a direct and proximate cause of the misrepresentations and determined reliance thereupon, Murpenter has lost *the benefit of the bargain* . . . ." *Id.* at 3 (emphasis added). Those alleged facts, when accepted as true, *do not establish* the elements of fraud. They establish a breach of contract.

In Pennsylvania, a breach of contract occurs when "there was a contract, the defendant breached it, and plaintiffs suffered damages from the breach." *McShea v. City of Philadelphia*, 995 A.2d 334, 340 (Pa. 2010). "When performance of a duty under a contract is due, any *nonperformance* is a breach" of the contract, not the tort of fraud. *Somerlot v. Jung*, 343 A.3d 324, 327 (Pa. Super. 2025), *reargument denied* (2025) (quoting RESTATEMENT

(SECOND) OF CONTRACTS § 235(2) (1981) and citing **Camenisch v. Allen**, 44 A.2d 309, 310 (Pa. Super. 1945)) (emphasis added).

Under Pennsylvania's gist-of-the-action doctrine, a party to a contract may not convert a breach of contract into a tort, if the other contracting party has not breached a general duty imposed by the law of torts. **See Bruno v. Erie Insurance Co.**, 106 A.3d 48 (Pa. 2014) (requiring courts to determine the gist of the action by examining what type of duty is alleged to have been breached); **see also Swatt v. Nottingham Village**, 342 A.3d 23, (Pa. Super. 2025) (*en banc*), *appeal denied*, 352 A.3d 452 (Pa. 2025).

Under **Bruno** and **Swatt** and basic concepts of the law of torts, Carmen Enterprises had no general duty to provide any of its customers' names or contact information to its competitor, Murpenter. Hence, Carmen Enterprises' alleged failure to provide all 1,915 names to Murpenter could not give rise to an action in tort, such as fraud.

Carmen Enterprises' duty to provide Murpenter with those 1,915 names arose solely under their Agreement and was purely a matter of contract. This is particularly true, where, as here, the Law Firm had no proof that Carmen Enterprises made a material misrepresentation in the inducement or execution of its Agreement with Murpenter. Simply stated, Murpenter did not allege that Carmen Enterprises lied to it about anything during contract negotiations or concealed anything when the parties executed the Agreement. Hence, it was legally impossible for fraud to lie against Carmen Enterprises based on the facts as Murpenter misunderstood them.

Moreover, in 2002, when the Law Firm filed the counterclaim of fraud, Mr. Carpenter knew the law better than Attorney Goldin. When Mr. Carpenter was under the impression that Carmen Enterprises had not fully performed its obligation under the Agreement, Mr. Carpenter did not accuse Carmen Enterprises of committing fraud. Rather, he correctly applied the law to the facts (as he viewed them) and "figured [out] that" Carmen Enterprises was "in **breach of contract**." Carpenter's Depo., 10/16/02, at 89 (emphasis added). In other words, even Murpenter's owner did not suspect Carmen Enterprises of having committed fraud against his company.

Because Murpenter's incorrect view of the facts did not support Attorney Goldin's decision to file a counterclaim of fraud, the statement of Judge Haaz in **Carmen I** – namely, that Murpenter truly believed it did not receive 1,915 customers' names – is irrelevant to whether Attorney Goldin lacked WUCPA probable cause to bring the counterclaim of fraud. The reliance of the Law Firm and Judge Patrick upon Judge Haaz's irrelevant comment is misplaced.

Carmen Enterprises' obligation arose under the terms of its Agreement with Murpenter. As a result, the only ground for a counterclaim, based on Murpenter's misunderstanding that Carmen Enterprises did not fulfill its contractual obligations, was breach of the Agreement. **See Bruno**, **supra**. Indeed, Murpenter's allegation – that Carmen Enterprises failed to provide all

the contractually required names – indicates the alleged gist of Murpenter's counterclaim was nonfeasance, rather than malfeasance.[6] *See id.*

Thus, Attorney Angstreich's expert opinion that Attorney Goldin lacked probable cause to file the counterclaim of fraud is legally correct and is, therefore, sufficient evidence from which a jury might find in favor of Carmen Enterprises. The trial court erred by discounting his expert opinion. Because Attorney Angstreich has correctly opined that Pennsylvania law in no way supported the counterclaim of fraud, a jury could find that Attorney Goldin knew or should have known that the facts, even as Murpenter misunderstood them in 2001 and 2002, *were not* evidence of fraud. Hence, the jury could thereby infer that Attorney Goldin lacked probable cause to file the counterclaim of fraud, rather than a counterclaim for breach of contract.

If the jury finds that probable cause was lacking at the time Attorney Goldin filed the counterclaim of fraud, then Attorney Goldin either was grossly ignorant of the law or he deliberately filed the counterclaim of fraud merely to delay the proceedings in *Carmen I* and/or increase Carmen Enterprises' litigation expenses. Thus, the jury could reasonably find that Attorney Goldin

_____

[6] By "gist," we mean that word according to its original, 15th-century definition. "[T]he ground/gist of the action was the defendant's unlawful act upon which the plaintiff's cause (or causes of action) would lie." *Swatt v. Nottingham Village*, 342 A.3d 23, 41, (Pa. Super. 2025) (*en banc*), *appeal denied*, 352 A.3d 452 (Pa. 2025); *see also id.* at n.13. As we held in *Swatt*, there are factual scenarios that support claims for both breach of contract and for tort, especially where a contract is negligently performed. The underlying action here was not such a case, because Murpenter alleged that Carmen Enterprises failed to perform the contract, not that Carmen Enterprises negligently performed it.

was grossly negligent or intentionally misused the civil proceedings in **Carmen I** by filing the counterclaim of fraud.

Furthermore, even if the jury finds that Attorney Goldin initially had probable cause to file the counterclaim of fraud, it might reasonably find that subsequent events fatally undermined that probable cause. For example, upon receiving Murpenter's counterclaims, Attorney Chasan contacted Attorney Goldin and explained that Carmen Enterprises had already provided all 1,915 names and contact information to Murpenter. Attorney Chasan told Attorney Goldin where to locate the full list of names for his client.

Three-and-a-half months later, Attorney Goldin wrote back to Attorney Chasan. He admitted to having, "in [his] custody the original Advanced Mail List software and the disk containing the list of names." October 11, 2002 Letter from Goldin to Chasan at 1. "I am going to make a copy of the disks for my files over the weekend and bring the originals to [Ms. Murphy's] deposition on Monday." **Id.** Attorney Goldin failed to produce the disk with the 1,915 customers' names at Ms. Murphy's deposition.

Even so, based on Attorney Goldin's October 11, 2002 Letter, a jury might conclude that he had the disk with the full list of customers' names but refused to produce that disk to continue prosecuting the now plainly meritless counterclaim of fraud. If so, a jury may deduce that Attorney Goldin was pursuing the counterclaim of fraud to obstruct and delay **Carmen I**, *i.e.*, for a "primary purpose" other than "securing the proper discovery, joinder of

parties or adjudication of the claim on which the proceedings were based." 42 Pa.C.S.A. § 8354(4).

Additionally, even if some scrap of probable cause remained to support the counterclaim of fraud thereafter, the jury might reasonably find that probable cause vanished during Attorney Chasan's October 22, 2002 deposition. On that day, Attorney Chasan handed Attorney Goldin "a copy of a disk that [he] copied from the MAIL list program on October 14," 2001 and gave to Murpenter. Chasan's Depo., 10/22/02, at 145. Attorney Chasan told Attorney Goldin, "your client can have as many copies of this list as you want. As I said, I made that copy from the computer hard drive last week." *Id.*

Because Attorney Chasan handed Attorney Goldin all 1,915 customers' names during the discovery phase of *Carmen I*, at that point, the jury could find that any remaining probable cause for a counterclaim of fraud had ended. The jury could infer that, by that point, Attorney Goldin knew or should have known that Carmen Enterprises could not have misrepresented the number or value of its customers' list, because Attorney Chasan had just given Attorney Goldin a disk with the full list of names. Thus, any belief that Carmen Enterprises had misrepresented its number of customers was, by that point, proven incorrect. The jury could reasonably find that, by the end of Attorney Chasan's October 22, 2002 deposition, Attorney Goldin no longer truly or reasonably believed the facts as Murpenter alleged them.

The jury, therefore, could easily conclude that Attorney Goldin was no longer prosecuting the counterclaim of fraud to secure "the proper discovery,

joinder of parties or adjudication of the claim on which the proceedings were based." 42 Pa.C.S.A. § 8354(4). In any of the above scenarios, a jury could reasonably find in favor of Carmen Enterprises on the first count in its operative complaint.

Thus, the trial court erred, as a matter of law, when it granted summary judgment to the Law Firm on Carmen Enterprises' first count.

4. The Counterclaim of Conversion

Similarly, Attorney Chasan's picking up and photocopying of Murpenter's employee manual did not form the basis for a counterclaim of conversion, even at the moment Attorney Goldin initially filed it. The law of Pennsylvania recognizes two torts involving the intentional touching, use, and damaging of another's personal property: trespass to chattels and conversion. These are distinct causes of action that protect different interests of owners of chattels. They therefore have unique elements.

Trespass to chattels is "committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." ***Pestco, Inc. v. Associated Products., Inc.***, 880 A.2d 700, 708 (Pa. Super. 2005) (quoting THE RESTATEMENT (SECOND) OF TORTS § 217 (1965)).

On the other hand, the "definition of conversion under Pennsylvania law is the ***deprivation*** of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." ***L.B. Foster Co. v. Charles Caracciolo Steel &***

***Metal Yard, Inc.***, 777 A.2d 1090, 1095 (Pa. Super. 2001) (emphasis added) (some punctuation omitted). In order for there to be a conversion, the deprivation must be complete – namely, the theft or total destruction of the good. Hence, as Carmen Enterprises correctly contends, the tort of conversion has a damage element in order for the cause of action to lie. "Our law is clear that the measure of damages for conversion is the market value of the converted property at the time and place of conversion." ***Id.*** at 1096.

The Reporter of THE RESTATEMENT (SECOND) OF TORTS, William L. Prosser explains that the differences between the two torts arose from their origins in separate forms of actions at common law. ***See*** Prosser, LAW OF TORTS § 14 at 76 (4th Ed. 1971). Today, the major distinguishing feature between a mere trespass to a chattel and its complete conversion lies in the degree of damage that the tortfeasor does to the chattel. Of "chief importance now is that there may be recovery where trespass would lie at common law, for interferences with the possession of chattels which are not sufficiently important to be classified as conversion, and so to compel the defendant to pay the full value of the thing with which he has interfered. Trespass to chattels survives today, in other words, largely as the little brother of conversion." ***Id.*** at 76-77.

Critically, under the modern approach, both torts require the proof of actual damages. Even for the lesser tort of trespass to chattels, "nominal damages will not be awarded, and . . . in the absence of any actual damage the action will not lie . . . [H]owever, to the extent that any loss of possession by the plaintiff [in an action for trespass to chattels] is regarded as necessarily

a loss of something of value, even if only for a brief interval . . . the requirement of actual damages is satisfied." ***Id.*** at 77-78.

By contrast, in order for an action of conversion to lie, the damage to the good must be a total loss of the value of the good to the original owner. In other words, conversion requires the complete "deprivation of another's right of property in, or use or possession of, a chattel . . . ." ***L.B. Foster***, 777 A.2d at 1095.

Dean Prosser teaches the differences between the two torts as follows:

> The theory of trespass was that the plaintiff remained the owner of the chattel, with his possession only interrupted or interfered with, so that when it was tendered back to him he must accept it. His recovery was limited to the damages he had sustained through loss of possession, or harm to the chattel, which were usually considerably less than the goods value. The theory of trover [based on an action of conversion] was that the defendant had appropriated the plaintiff's chattel, for which he must pay. The plaintiff was therefore not required to accept it when it was tendered back to him; and he recovered as damages the ***full value of the chattel*** at the time and place of conversion. When the defendant satisfied the judgment in trover the title to the chattel passed to him, and the plaintiff had nothing more to do with it. The effect was that the defendant was compelled, by his wrongful appropriation, to buy the chattel at a forced sale, of which the action of trover was the judicial instrument.
>
> The modern law of conversion began when this basic difference between the theories of trespass and trover was brought into sharp focus in ***Fouldes v. Willoughby*** [151 Eng. Rep. 1153 (Exch. 1841). There, the] defendant wrongfully refused to carry plaintiff's horses on a ferry-boat and put them off. The plaintiff remained on the boat and, as a result, lost his horses. [The Court of Exchequer] held that this was a trespass, but not a conversion, because there was no interference with the plaintiff's "general right of

dominion" over the horses. At about the same time, in [***Johnson v. Weedman***, 5 Ill. 495 (1843)], a young lawyer named Abraham Lincoln succeeded in convincing the court that there was no conversion when a horse, left with the defendant to be agisted and fed, was ridden, on one occasion, for a distance of 15 miles, since it was not a sufficiently serious invasion of the owner's rights.

Following such decisions, the tort of conversion has been confined to those major interferences with the chattel, or with the plaintiff's right in it, which are so serious, and so important, as to justify the forced judicial sale [of the chattel] to the defendant which is the distinguishing feature of the action. Trespass remains as an occasional remedy for minor interferences, resulting in some damage, but not sufficiently serious or sufficiently important to amount to the greater tort [of conversion].

Prosser, ***supra***, § 15 at 80-81 (emphasis added).

Here, by picking up the manual, taking it to a copy machine located in the same office space, and returning it to the employee's desk while she was not there, Attorney Chasan, in his role as an officer of Carmen Enterprises, could not possibly have committed the greater tort of conversion. Based on the facts as alleged in Murpenter's pleadings in ***Carmen I***, Attorney Goldin would have been hard pressed to prove that Carmen Enterprises had even committed the lesser tort of trespass to chattels, for the simple reason that Murpenter neither pleaded nor proved actual damages to the employee's manual. Touching and carrying someone else's personal property around their office, for a short time, does not constitute the tort of conversion, especially where, as here, the chattel suffered no actual damage. Attorney Chasan deprived Murpenter of nothing.

Therefore, it stands to reason that a jury may find that Attorney Goldin lacked probable cause under the WUCPA to initiate the counterclaim of conversion. Like Murpenter's counterclaim of fraud, Murpenter's counterclaim of conversion was a legal nonstarter even before Attorney Goldin filed it. As a result, the jury might logically infer that Attorney Goldin brought and continued to prosecute the counterclaim of conversion only to obstruct the proceedings in **Carmen I**.

Hence, the trial court erroneously granted summary judgment to the Law Firm on count two in the operative complaint.

### 5. Murpenter's Other Counterclaims

Having concluded that the trial court erroneously found Carmen Enterprises' evidence insufficient to prove that Attorney Goldin lacked probable cause under the WUCPA for the two counterclaims, we turn to the Law Firm's arguments that this Court should affirm the trial court's grant of summary judgment on an alternative basis.

The Law Firm contends that, because Murpenter brought other counterclaims, and because Carmen Enterprises did not contend that Attorney Goldin lacked probable cause for those other counterclaims, then Carmen Enterprises' entire WUCPA action must be dismissed. As mentioned, the Law Firm claims that, under federal cases, "If a party possesses probable cause for some of its claims [in the underlying action], even if not for all of its claims, it is not subject to liability under the [WUCPA]." Law Firm's Brief at 49.

First, the Law Firm points to the fact that, in **Carmen I**, Murpenter also filed a counterclaim of set off and that Carmen Enterprises did not bring a count under the WUCPA based on that counterclaim. The Law Firm, quoting from Attorney Chasan's deposition, suggests that Carmen Enterprises "admitted it cannot now challenge whether the setoff counterclaim was supported by probable cause, [and, therefore,] its entire cause of action is deficient" under the federal precedents. **Id.** at 51.

This argument is based upon the Law Firm's narrow reading of the record. By focusing solely on one answer of Attorney Chasan and by taking that answer out of context, the Law Firm gives the improper impression that the counterclaim of set off was a stand-alone cause of action in **Carmen I**. However, as we explained above, it was not.

Murpenter's counterclaim of set off did not assert a separate cause of action for which additional probable cause by Attorney Goldin might have existed. Instead, the third counterclaim merely incorporated Murpenter's first and second counterclaims by reference and sought to reduce whatever judgment Carmen Enterprises might win to "the extent that [Carmen Enterprises] is found to be liable to Murpenter under the preceding [counter]claims or under the [Agreement] . . . ." Murpenter's First Amended New Matter Counterclaim in **Carmen I** at 4.

Hence, it is entirely unnecessary for Carmen Enterprises to allege or to prove that there was no probable cause for Attorney Goldin to include the third counterclaim of set off in Murpenter's pleadings. Any finding of the jury that

Attorney Goldin lacked probable cause to bring counterclaims of fraud and conversion will encompass the third counterclaim, because it was derivative and depended entirely upon Murpenter's success in its first two counterclaims. To whatever extent Attorney Goldin lacked probable cause for filing or continuing to prosecute the first and second counterclaims, he equally lacked probable cause as to the third counterclaim.

Hence, Carmen Enterprises had no need to bring a WUCPA count based on Murpenter's counterclaim for set off in *Carmen I*. Any count based solely on the third counterclaim would have been duplicative of Carmen Enterprises' counts based on the first and second counterclaims.

Second, the Law Firm believes that Carmen Enterprises cannot maintain this action under the WUCPA, because it "settled" a fourth counterclaim for breach of contract, which Murpenter never actually filed in *Carmen I*. In the Law Firm's view, because Carmen Enterprises was willing to "settle" the unfiled counterclaim, it conceded that Attorney Goldin had probable cause for that unfiled counterclaim. This contention has no basis in the language of the statute or our precedents.

The Probable Cause Section of the WUCPA makes no reference to a party's unfiled claims or counterclaims. Under that section, probable cause is based upon whether the WUCPA defendant "reasonably believes in the existence of the facts upon which the claim is based, and either (1) reasonably believes that under those facts the claim may be valid under the existing or developing law . . . [or] (3) believes as an attorney of record, in good faith

that his procurement, initiation or continuation of a civil cause is not intended to merely harass or maliciously injure the opposite party." 42 Pa.C.S.A. § 8352.

The plain language of Section 8352 refers only to "the claim" that the party actually filed in the underlying lawsuit, as opposed to "potential," "hypothetical," or "threatened" claims or counterclaims. Furthermore, nothing in the plain language of Section 8352 states that probable cause may be imputed by the concession of the other party through settlement of a single claim or counterclaim, whether filed or only threatened to be filed. Therefore, the Law Firm's interpretation of the Probable Cause Section is impermissible under the Statutory Construction Act.

This Court "may not add provisions that the General Assembly has omitted unless the phrase is necessary to the construction of the statute." **Commonwealth v. Garner**, 301 A.3d 462, 466 (Pa. Super. 2023). The Law Firm makes no argument as to how or why the words that it impliedly wishes to add to the WUCPA are necessary to our construction of the statute.

Additionally, the case upon which the Law Firm relies concerning its claim of "settlement" is **D'Elia v. Folino**, 933 A.2d 117 (Pa. Super. 2007). Based on that case, the Law Firm argues that Carmen Enterprises' "settlement" of an unfiled breach-of-contract counterclaim completely bars Carmen Enterprises' WUCPA action. We disagree.

In **D'Elia**, Roseanne McLaughlin sued Dr. Frank D'Elia and his urology partners for malpractice. Anita Folino, Esq.; Joel F. Bigatel, Esq.; and their

law firm of Plunkett & Cooney, P.C. represented Ms. McLaughlin in that malpractice case. The trial court granted summary judgment to the doctors and, while that order was on appeal to this Court, Ms. McLaughlin and the doctors entered into a settlement agreement. Therein, the doctors promised not to sue Ms. McLaughlin under the WUCPA.

Nevertheless, Dr. D'Elia attempted to maintain an ongoing WUCPA case against Ms. McLaughlin's attorneys and law firm. The trial court sustained the attorneys' and law firm's preliminary objections, and this Court affirmed on appeal. We said, "when considering the question of 'favorable termination' [under 42 Pa.C.S.A. § 8354(2)], whether a withdrawal or abandonment constitutes a favorable, final termination of the case against who the proceedings are brought initially **depends on the circumstances** under which the proceedings are withdrawn." **Id.** at 122 (emphasis added).

"A withdrawal of proceedings stemming from a compromise or agreement does not, as a matter of law, constitute a termination favorable to the party against whom proceedings have been brought originally." **Id.** (citing **Rosenfield v. Pennsylvania Auto. Insurance Plan**, 636 A.2d 1138, 1142 (Pa. Super. 1994). This is due to the fact that, where a lawsuit is settled and discontinued, "the parties to the underlying suit agree jointly to end the underlying suit in a non-litigious nature, the liability of the underlying defendant, *i.e.,* the plaintiff in the wrongful-use-of-civil-proceedings suit, is never determined with finality." **Id.** at 122–23. Under the circumstances of **D'Elia**, the plaintiff-doctor's "liability, or lack thereof, was never and can never

be determined with finality. As such, [Dr. D'Elia] was not the 'victor' in the underlying lawsuit, and he cannot, as a matter of law, prevail against [the attorneys and law firm] in a wrongful-use-of-civil-proceedings suit." *Id.* at 123.

Here, by contrast, **Carmen I** was neither settled nor withdrawn. That litigation continued to a bench trial, the Court of Common Pleas of Montgomery County issued a final judgment that Murpenter (rather than Carmen Enterprises) was liable for breach of the Agreement, and this Court affirmed that judgment on appeal. Thus, unlike Dr. D'Elia, whose liability for malpractice was never determined, the liability of Murpenter for breach of contract is known and a matter of public record.

We hold that, under these circumstances, even if Carmen Enterprises and Murpenter "settled" the unfiled counterclaim for breach of contract, as the Law Firm believes, it is undisputed that that counterclaim was meritless. Carmen Enterprises did not breach the Agreement; Murpenter did. Thus, the Law Firm's contention – *i.e.*, that Carmen Enterprises conceded that Murpenter and Attorney Goldin had probable cause for the unfiled counterclaim of breach of contract – lacks any support in the record. Whereas Dr. D'Elia was not a victor in his underlying action, Carmen Enterprises undoubtedly was the victor of **Carmen I**.

Moreover, the **D'Elia** Court did not hold that the settlement of the underlying lawsuit conceded that the attorneys and the law firm had probable cause to sue Dr. D'Elia for malpractice. Instead, we held that settlement and

withdrawal of the malpractice case negated the "proceedings were terminated in his favor" element of the WUCPA. 42 Pa.C.S.A. § 8354(2). That is an entirely different element from the "existence of probable cause" test, under 42 Pa.C.S.A. § 8352. Simply put, because *D'Elia* was not a probable-cause case, the Law Firm's reliance upon that decision to defeat Carmen Enterprises' entire WUCPA action, as a matter of law, is misplaced.

We therefore hold that the Law Firm's alternative bases for affirmation are meritless under the circumstances of this case. Thus, we need not decide whether the interpretation of the federal courts, applying the WUCPA, is a correct exposition of Pennsylvania law today.

## IV.   Conclusion

Although we hold that Attorney Chasan, in his role as counsel to Carmen Enterprises in *Carmen I*, has no standing to sue the Law Firm, his corporation, Carmen Enterprises, may place its WUCPA claims before a jury. It adduced sufficient evidence, including an expert report, from which a jury may rationally find that Attorney Goldin (and, by extension, Fox Rothschild) lacked probable cause to bring or continue prosecuting the counterclaims that he filed in *Carmen I*. On the other hand, the jury may credit the Law Firm's own expert that probable cause existed and continued to exist until the Court of Common Pleas of Montgomery County granted partial summary judgment to Carmen Enterprises on the counterclaims. A battle of the experts such as this is a classic example of genuine issues of fact for a jury – not a court – to resolve.

Furthermore, we hold that the trial court erred by allowing the Law Firm to clawback the December 20, 2005 Fax. The Law Firm failed to offer competent evidence that the attorney-client privilege or the work-product rule shielded the fax from discovery. Thus, the fax remains part of the properly produced and discovered evidence in this case.

Order sustaining preliminary objection to Attorney Chasan's standing affirmed. Order denying Carmen Enterprises' discovery motion reversed. Order granting summary judgment to the Law Firm reversed. Case remanded for trial.

Jurisdiction relinquished.


Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary


Date: 6/9/2026